UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FAIR HOUSING CENTER OF CENTRAL INDIANA, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> GRANDVILLE COOPERATIVE INC., et al., <br><br> Defendants. | No. 1:16-cv-00300-LJM-DML |

## ORDER ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

This matter comes before the Court on Defendants', Grandville Cooperative Inc. ("Grandville"), Karen Mitchell, and Kirkpatrick Management Company, Inc. ("Kirkpatrick") (collectively "Defendants"), Second Motion for Judgment on the Pleadings ("Motion") pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)") (Dkt. 72) on Plaintiffs', Fair Housing Center of Central Indiana ("Fair Housing Center"), Virginia Morton, Sharna McFarland, and Lindsay Adams (collectively "Plaintiffs"), Third Amended Complaint ("Amended Complaint"). The Amended Complaint alleges that the Defendants (1) committed discriminatory housing practices in violation of both the Fair Housing Act ("FHA"), 42 U.S.C § 3601, *et seq.*, and the Indiana Fair Housing Act ("IFHA"), Ind. Code § 22-9.5; (2) discriminated against the Plaintiffs in the operation of Grandville in violation of the Rehabilitation Act, 29 U.S.C. § 794; and (3) committed negligence by failing to adequately train, monitor, and supervise employees to ensure compliance with the FHA,

1

IFHA, and Rehabilitation Act.[1] Dkt. 62. For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion.

## I. BACKGROUND

### A. GRANDVILLE COOPERATIVE

Grandville is a 156-unit housing complex located in Indianapolis, Indiana. *Id.*, ¶ 16. It receives federal housing funds as well as financing and was constructed using the United States Department of Housing and Urban Development ("HUD") Section 236 mortgage program. *Id.*, ¶ 17. Grandville has a Section 8 Project-Based Rental Assistance contract, which it utilizes to make rent affordable to lower income tenants. *Id.*

Grandville is a cooperative corporation property, which provides each member of the cooperative one share and one vote in the cooperative. *Id.*, ¶ 18. The cooperative holds title to the property. *Id.* Grandville members elect a Board of Directors that establishes policies, sets forth rules, and determines how money is spent. *Id.*, ¶ 19. Prospective residents must meet the standards set forth by the Grandville Board of Directors. *Id.*, ¶ 20.

Kirkpatrick is a property management company in Indianapolis. *Id.*, ¶ 21. Kirkpatrick provides services to Grandville and is identified as the property manager on Grandville's materials. *Id.*, ¶ 22. Kirkpatrick has provided onsite staff to direct the management and direction of Grandville. *Id.* Kirkpatrick is responsible for ensuring that Grandville's board and staff act in compliance with fair housing laws. *Id.*, ¶ 23. Kirkpatrick also provides guidance for screening and selecting prospective residents, including the

---

[1] The claims brought under the Rehabilitation Act and for negligence are only alleged against Kirkpatrick and Grandville. Dkt. 62, ¶¶ 86-87, 90-91.

2

creation of forms used by Grandville. *Id.*, ¶ 24. Kirkpatrick's name is prominently displayed on a variety of Grandville materials, including Grandville's website. *Id.*

### B. SHARNA MCFARLAND AND VIRGINIA MORTON

Morton is quadriplegic. *Id.*, ¶ 26. Morton relies on her daughter, McFarland, as well as a part-time at-home nurse for assistance. *Id.*, ¶ 27. In December 2014, McFarland visited the Grandville front office and expressed an interest in living there. *Id.*, ¶ 28. Specifically, McFarland sought a two-story townhouse, with three bedrooms upstairs and the living space downstairs, including a half bathroom, kitchen, dining room, and living room. *Id.*, ¶ 29. McFarland and her two children intended to use the upstairs bedrooms while Morton planned on staying in the downstairs living room because she is largely confined to a hospital bed due to her paralysis. *Id.* During the visit in December 2014, McFarland was informed that she needed to fill out an application and pay $20.00 to secure a spot on the waitlist, which she did. *Id.*, ¶ 30.

Several months later, Grandville inquired as to whether McFarland was still interested in a residence and she responded that she was. *Id.*, ¶ 31. McFarland visited Grandville once more and asked if Grandville required Morton to fill out a separate application. *Id.* ¶ 32. Camille Mitchell, one of Karen Mitchell's daughters who works as a leasing agent for Grandville, informed McFarland that she needed to fill out a separate application on Morton's behalf and submit another $20.00, which she did. *Id.* A few weeks later, McFarland received a letter from Grandville that stated: "This Letter is to notify you that Grandville Cooperatives' Board of Directors has scheduled a mandatory New Member Orientation, time listed below." *Id.*, ¶ 33.

3

On August 5, 2015, McFarland attended the orientation. *Id.*, ¶ 36. Karen Mitchell and two other board members were also in attendance. *Id.*, ¶ 37. During the meeting, McFarland mentioned that Morton could not climb stairs. *Id.*, ¶ 38. McFarland was then asked why and she explained that Morton was quadriplegic. *Id.* The directors then asked several questions about Morton's disability, including how Morton became quadriplegic, how long she had quadriplegia, and who takes care of her. *Id.* Karen Mitchell then told McFarland that this was not a "New Member Orientation" but a "Pre-Interview" meeting. *Id.* ¶ 39.

On the same day as the "New Member Orientation Meeting," Karen Mitchell circled "rejected" on the "Grandville Coop Application Cover Page" for Morton and McFarland's application. *Id.* ¶ 74. The document provides check boxes corresponding to various reasons for denying an application. *Id.* ¶ 75. Neither the box for "We are not accepting applications for the unit size your household requires" nor the box for "You have provided insufficient or inaccurate information on your application" is checked. *Id.* The form does not state why Morton and McFarland's application was rejected. *Id.*

A few days after the meeting, McFarland received a letter from Grandville dated August 5, 2015, the same day as the meeting. *Id.* ¶ 40. The letter was signed by Camille Mitchell and identified Camille as "Office Staff, Property Manager / Agent for Owner." *Id.* The letter read: "We are sorry to let you know that we must reject your application. At this time, Grandville Cooperative is not handicap accessible and it will be a liability to offer you a unit that is not accommodating to everyone in the household." *Id.*

Karen Mitchell discussed the rejection of McFarland and Morton's applications with her daughter Tia Mitchell. *Id.* ¶¶ 63, 65. Karen Mitchell told Tia that she rejected

4

McFarland and Morton's applications because Morton needed a hospital bed in the living room, which she believed was "tacky." *Id.* ¶¶ 66, 67.

Karen Mitchell also discussed McFarland and Morton's application with Bill Kersey, a maintenance employee and resident of Grandville. *Id.* ¶¶ 69, 70. Mitchell inquired with Kersey as to what would be required for a quadriplegic person to move in. *Id.* ¶ 72. He believed they might need to widen doorways or install a ramp, to which Mitchell responded, "no, that's not going to work" and also stated that "with her living downstairs in the living room and her daughter upstairs, we don't want that around here." *Id.* ¶¶ 71, 72.

### C. THE FAIR HOUSING CENTER OF CENTRAL INDIANA

After receiving the rejection letter, McFarland contacted the Fair Housing Center. *Id.* ¶ 44. The Fair Housing Center is a private, non-profit corporation that seeks to ensure equal hosing opportunities by eliminating housing discrimination. *Id.* ¶ 6. After interviewing McFarland, the Fair Housing Center sent a letter to Grandville indicating that it would be investigating McFarland's allegations. *Id.* ¶ 45.

During its investigation, the Fair Housing Center interviewed two dozen Grandville residents, twenty of whom reported discrimination against families with children. *Id.* ¶ 48. Fourteen residents reported that children are not allowed to play on the grass, fourteen other residents reported that children are not allowed to play out in front of residences, and six residents reported that Karen Mitchell would yell and even swear at children whenever she thought the children were violating the rules. *Id.* ¶, 49. Bill Kersey also reported seeing Mitchell yell at children approximately six times, and hearing her swear at children on a few occasions. *Id.* ¶ 73.

5

The Fair Housing Center obtained various materials from Grandville residents that set forth Grandville's rules restricting children's use of common areas ("Rules"). *Id.* ¶ 50. The Rules stated that (1) children could not play in front of the residences ("play-in-front rule"), (2) children under the age of 10 are not to be outside on the grounds without any supervision ("supervision rule"), and (3) no children should be in the common areas after 9:00 p.m. ("curfew rule"). *Id.* ¶¶, 50, 51; Dkts. 36-6, 36-7, 36-8.

### D. LINDSAY ADAMS

Adams is one of the Grandville residents who reported the Rules to the Fair Housing Center. *Id.* ¶ 54. Adams has lived at Grandville with her young children since 2013. *Id.* She has repeated received notices from Grandville that contain the three Rules regarding children. *Id.* ¶ 55. The Rules have been enforced against both Adams and her children. *Id.* ¶¶ 58, 59. Adams has also received multiple notices, often threatening eviction, which informed her that she or her children have violated the Rules. *Id.* ¶ 59. One notice from June 20, 2014, informed Adams about recent violations to the Rules about children. *Id.* ¶ 76. The notice's purpose was "to serve as a reminder and warning to those members it applies to, if there are continued complaints of unsupervised children then individual households will receive a violation notice. Any violation can be cause for termination of membership." *Id.* Because of this notice, and other notices threatening eviction, Adams stopped allowing her children to play outside. *Id.* ¶ 59.

Adams believes the Rules are unreasonable, particularly with respect to the play-in-front rule, denying children a perfect place to play. *Id.* ¶¶ 56, 57.

6

## II. **ANALYSIS**

Defendants have moved, pursuant to Rule 12(c), to dismiss the allegations set forth in Plaintiffs' Amended Complaint. Dkt. 72. Specifically, Defendants argue that the Plaintiffs have failed to state a valid claim: (1) for negligence; (2) against Mitchell in her individual capacity; (3) for familial status discrimination under the FHA; or (4) for disability discrimination under the FHA. Dkt. 73.

"After the pleadings are closed … a party may move for judgment on the pleadings." Rule 12(c). A motion for judgment on the pleadings is governed by the same standard as a motion for failure to state a claim under Federal Rule of Procedure 12(b)(6) ("Rule 12(b)(6)"). *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). Rule 12(b)(6) permits the dismissal of a claim for failure to state a claim upon which relief can be granted in the pleadings. The Court construes "the complaint in the light most favorable to the nonmoving party and will grant the motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Buchanan-Moore*, 570 F.3d at 827 (internal quotation marks omitted).

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but a plaintiff's complaint may not merely state "an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

7

alleged[,]" not when the plaintiff only raises a "sheer possibility that the defendant has acted unlawfully." *Id.* "[T]he height of the pleading requirement is relative to the circumstances[,]" *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009), and "[d]etermining the plausibility of a claim is a context-specific task that requires [the Court] to draw on [its] judicial experience and common sense." *Brown v. JP Morgan Chase Bank*, 334 Fed. Appx. 758, 759 (7th Cir. 2009).

## A. NEGLIGENCE

Defendants first assert that the Plaintiffs' negligence claim against Kirkpatrick and Grandville must fail as a matter of law. The Amended Complaint alleges negligence against Kirkpatrick and Grandville for failure to train, monitor, and supervise both Camille and Karen Mitchell, and to ensure compliance with the fair housing statutes and applicable regulations. In support, Defendants argue that Plaintiffs are unable to establish a duty of care owed by either Grandville or Kirkpatrick to any of the Plaintiffs. Plaintiffs respond that Indiana's three-part balancing test to determine a duty favors such a finding here. Plaintiffs ask this Court to find that Defendants have a duty to educate employees about the strictures set forth by the FHA, IFHA, and Rehabilitation Act.

To prevail on their negligence claim, Plaintiffs must show: "(1) duty owed to the plaintiff by defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care, and (3) compensable injury proximately caused by defendant's breach of duty." *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010). "Absent a duty there can be no negligence or liability based upon the breach." *Id.* Indiana uses a "three-part balancing test to determine whether a duty exists when it has not been declared or otherwise articulated." *Spierer v. Rossman*, 798 F.3d 502, 510-11 (7th Cir.

8

2015) (citing *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003)). The three parts are: (1) the relationship between the parties; (2) the foreseeability of the occurrence; and (3) public policy concerns. *Spierer*, 798 F.3d at 511. "Whether a duty exists is generally a question of law for the court." *Yost v. Wabash College*, 3 N.E.3d 509, 515 (Ind. 2014).

"A duty of reasonable care is not, of course, owed to the world at large, but arises out [of the] relationship between the parties." *Clary v. Dibble*, 903 N.E.2d 1032, 1038 (Ind. Ct. App. 2009). Such an inquiry "focuses on whether or not the defendant … owes a duty to the particular plaintiff." *Rodriguez v. United States Steel Corp.*, 24 N.E.3d 474, 477 (Ind. Ct. App. 2014) (quotations omitted).

Here, Plaintiffs have failed to allege any duty of reasonable care that Grandville or Kirkpatrick owed to any particular Plaintiff beyond the speculative level. The mere assertion that Grandville and Kirkpatrick failed to supervise the Mitchells in compliance with housing laws is far too attenuated to establish a particular duty to the Plaintiffs. Indeed, Plaintiffs set forth no factual allegations with respect to the training of either of the Mitchells, except for the fact that Kirkpatrick is responsible for such training. Thus, Plaintiffs bare assertion fails to allow the Court to "draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged[,]" and merely raises a "sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Moreover, Plaintiff cites to no authority that would establish the presence of a duty to train or supervise employees under the FHA, IFHA, or Rehabilitation Act. Indeed, courts in other jurisdictions have rejected similar claims. *See, e.g. Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 365 (E.D. Va. 2011) (granting summary judgment

on plaintiff's negligence claim predicated on a common law duty to train employees on FHA reasonable accommodations); *Hand v. Gilbank*, 752 N.Y.S.2d 501, 502 (N.Y. Sup. Ct. 2002) (finding that the FHA "was not intended to create a standard of care in negligence litigation"); *Fair Hous. Council of Or. v. Brookside Vill. Owners Ass'n*, No. 3:08-cv-3127, 2012 WL 8017842, at *27-28 (D. Or. Oct. 19, 2012) *adopted*, No. 3:08-cv-03127 2013 WL 1914378 (D. Or. May 8, 2013) (rejecting plaintiff's assertion that the Oregon fair housing statute, which is interpreted consistently with the FHA, "is intended to impose a common law duty on housing developments … to train their employees in fair housing laws.").

The Plaintiffs acknowledge that this duty is not recognized by several other courts as stated by the Defendants. Nonetheless, Plaintiffs cite three cases for this same argument, all three of which are wholly inapplicable. Dkt. 77 at 27 (citing *Woods v. Forester*, 884 F. Supp. 1169, 1178 (N.D. Ill. 1995) (holding that a "duty exists to refrain from employing individuals that the employer knows, or should know, are a danger to others."); *McAlister v. Essek Prop. Tr.*, 504 F. Supp. 2d 903, 911 (C.D. Cal. 2007) (Defendants did not contest that they were liable for breach of duty to reasonably accommodate a tenant's disability); *So. Cal. Hous. Rights Ct. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1069 (C.D. Cal. 2005) (precluding summary judgment for determination on whether reserving parking space was reasonable accommodation and necessary for use and enjoyment of a dwelling)). Thus, the Plaintiffs have failed to allege sufficient factual allegations to state a claim for negligence that is plausible on its face. *Iqbal*, 556 U.S. at 678.

## B. FAMILIAL STATUS DISCRIMINATION

Defendants further allege that Plaintiffs have failed to state a claim for familial status discrimination, which is defined as "'discrimination against parents or other custodial persons domiciled with children under the age of 18.'" *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n. 1 (1995) (citing 42 U.S.C. § 3602(k)). Defendants rely on *Halprin v. The Prairie Single Family Homes of Dearborn Park Assoc.* to argue that the FHA does not protect against post-acquisition discrimination, i.e. discrimination that takes place after the purchase or lease of a dwelling. 388 F.3d 327, 329-30 (7th Cir. 2004). Indeed, the *Halprin* court found that the FHA, in both its language and legislative history, was only concerned with access to housing, with the sole focus was on exclusion of minority classes. *Id.* at 330.

A full panel of the Seventh Circuit revisited *Halprin* in *Bloch v. Frischolz*, which found that "in some circumstances homeowners have an FHA cause of action for discrimination that occurred after they moved in." 587 F.3d 771, 772 (7th Cir. 2009) (en banc). The Defendants briefly address the *Bloch* holding, but only do so with respect to Section 3604(a), while Plaintiffs seek redress under Sections 3604(b) and (c). Dkt. 73 at 13-14. Importantly, the court in *Bloch* found that a plaintiff could pursue a post-acquisition claim under Section 3604(b). *Bloch*, 587 F.3d at 780-81. The court found that the Blochs' agreement to subject their rights to the restrictions set forth by the housing board was a "condition" of their purchase; "the Board's power to restrict unit owners' rights flows from the terms of the sale. And the Blochs alleged that the Board discriminated them in wielding that power." *Id.* at 780. In making this finding, the court found persuasive the HUD regulations that prohibit "[l]imiting the use of privileges, services or facilities

associated with a dwelling because of … familial status." *Id.* at 780-81 (citing 24 C.F.R. § 100.65(b)(4)).

Assuming all facts in the Plaintiffs' favor yields a similar result as that proposed in *Bloch*. Plaintiffs allege that the Rules limit the use of the privileges and facilities of Grandville for families with children. Under *Bloch* and the Rule 12(b)(6) standard, this is sufficient to state a plausible claim of relief under the FHA.

The Defendants argue two more grounds for dismissal of Plaintiffs' familial status claim. The Defendants first argue that Plaintiffs did not plead that Defendants intentionally discriminated against them, which Defendants allege – for the first time in their reply brief – is required to pursue a claim for post-acquisition discrimination under Section 3604(b). Dkt. 79 at 6. This argument was not addressed in Defendants' initial brief and is therefore waived. *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011) ("[I]t is well established that arguments raised for the first time in a reply brief are waived."). Defendants focused their arguments for dismissal of the familial status claims solely on the *Halprin* analysis, which fails at this stage in the proceedings for the reasons already stated.

Defendants' final argument concerns the Rules themselves. Defendants essentially argue that the Rules are facially neutral and that none of the Plaintiffs has established a causal connection between the Rules and any injury.[2] But the Rules

---

[2] Defendants also argue that the supervision rule should be dismissed because it is "novel to every jurisdiction across the country (except California) [and therefore] should be rejected and dismissed as a matter of law." They also argue that the curfew rule mirrors Ind. Code §§ 31-37-3-3 and 31-37-3-4 and therefore cannot form the basis for a discrimination claim. Defendants conclusory remarks are unaccompanied by any applicable legal support and are therefore waived. *See Puffer v. Allstate Ins. Co.*, 675

12

themselves are not the issue; rather, the Rules are merely a vehicle by which the Defendants discriminate against families with children. Plaintiffs need only show that discrimination is plausible, not the manner in which each and every rule has injured the Plaintiffs. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary, the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'") (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiffs have alleged that more than twenty individuals reported discrimination against families with children by and through the Rules that limit their use of the facilities at Grandville. Dkt. 62, ¶¶ 48, 49. This states a plausible claim for relief for familial status discrimination. *See Bloch*, 587 F.3d at 780-81; 24 C.F.R. § 100.65(b)(4).

### C. DISABILITY DISCRIMINATION

Defendants also claim that Plaintiffs' Amended Complaint fails to state a claim for disability discrimination relief under the FHA, IFHA, or Rehabilitation Act. Defendants first allege that the Amended Complaint does not specifically recite the elements of the claims and does not contain sufficient facts to indicate a theory for discrimination. Such an argument attempts to impose a greater burden on the Plaintiffs than is necessary at this phase of the proceedings, for "[i]t does not take much to allege discrimination[.]" *Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014). Plaintiffs need only allege the type of the discrimination, by whom, and when the discrimination took place. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *see also Huri v. Office*

---

F.3d 709, 718 (7th Cir. 2012) (arguments are waived "if they are undeveloped, conclusory, or unsupported by law.").

*of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 834 (pleading for discrimination need only "describe events that *could* have happened and which discovery can be reasonably expected to reveal.").

Plaintiffs have met this threshold in the instant case. Plaintiffs also pled that that Morton has quadriplegia, which renders her disabled. Dkt. 62, ¶¶ 1, 7. Plaintiffs pled that Defendants became aware of this disability at the meeting with McFarland. *Id.*, ¶¶ 36-40. Plaintiffs further pled that Defendants sent a rejection letter explicitly stating that it would not rent to Morton or McFarland due to Morton's disability. *Id.*, ¶ 40. Nothing more is required.[3]

### D. AUGUST 5, 2015, LETTER AND INQUIRY INTO DISABILITY

Defendants argue that Plaintiffs present two theories in their response brief that are not set forth in the Amended Complaint, which in turn does not provide them adequate notice and therefore should be dismissed. The first theory concerns the August 5, 2015, letter to Morton and McFarland, which the Plaintiffs allege in their response violates 42 U.S.C. § 3604(c). Section 3604(c) makes it unlawful "to make, print, or publish, … any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on … handicap [or] familial

---

[3] Defendants urge the Court to apply the standard set forth in *Hamilton v. Svatik*, which requires a Plaintiff to establish that: (1) she belongs to a minority; (2) Defendants were aware of her minority status; (3) Plaintiff was ready and able to accept Defendants' offer to rent; and (4) Defendants refused to deal with the Plaintiff. 779 F.2d 383, 387 (7th Cir. 1985). Specifically, Defendants contend that Plaintiffs have failed to allege that Morton and McFarland were ready and able to accept Defendants' offer. Even assuming, *arguendo*, that this analysis applied, Plaintiffs sufficiently pled that Morton and McFarland were ready to accept the unit by pleading that they applied for that unit, paid an application fee, and even provided detail as to how they intended to occupy it. Dkt. 32, ¶¶ 29, 30, 32.

14

status …, or an intention to make any such preference, limitation or discrimination." Second, Defendants contend that Plaintiffs' assertion that the Defendants' inquiry into Morton's disability constituted a discriminatory housing practice. Pursuant to 24 C.F.R. § 100.202(c), it is a discriminatory housing practice to "make an inquiry to determine whether an applicant for a dwelling … has a handicap or to make inquiry as to the nature or severity of a handicap of such a person."

Defendants believe that neither of these legal theories were adequately presented in the Amended Complaint. But Plaintiffs are not required to plead specific provisions or legal theories. *See Del Marcelle v. Brown Ct. Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (en banc) (per curiam) ("[P]laintiff's are not required to plead legal theories, even in the new world of pleading that is developing in the wake of … *Twombly* … and … *Iqbal*."). At this stage, Plaintiffs need only state a plausible claim that allows the Court to draw a reasonable inference that the Defendants' actions are discriminatory in nature. *See Iqbal*, 556, U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") Plaintiffs quoted the allegedly discriminatory language from the letter in the Amended Complaint and also stated that the Defendants inquired into Morton's disability. Dkt. 62, ¶¶ 38, 40. This is sufficient for the Court to make a reasonable inference of discrimination.

### E. KAREN MITCHELL

Defendants also move to dismiss all claims against Karen Mitchell in her individual capacity, and argue that she is immune from liability because she acted in her capacity as director of Grandville at all times. In support, Defendants cite *Clarke v. Universal*

*Builders* for the proposition that the corporate identity is to be kept intact absent "exceptional circumstance." 409 F. Supp. 1274, 1281 (N.D. Ill. 1976). The Defendants also cite to *City of Chi. v. Matchmaker Real Estate Sales Ctr., Inc.*, which provides that "where common ownership and management exists, corporate formalities must not be rigidly adhered to when inquiry is made of civil rights violations." 982 F.2d 1086, 1098 (7th Cir. 1992) (internal quotations omitted). *Matchmaker* found that the sole owner/chief executive officer of a corporation was personally liable for violating the FHA because he supervises the day-to-day operations of his company and its agents. *Id.* The Defendants also claim that Mitchell is immune from Plaintiffs' state law claims under Indiana's Nonprofit Corporations Act, which provides immunity to volunteer directors for actions taken in their capacity for the corporation. Ind. Code § 23-17-13-1. A director may only be held personally liable under the Nonprofit Corporations Act when she has not exercised "business judgment in good faith, with the care of an ordinarily prudent person, in a manner reasonably believed to be in the best interests of the corporation, and the breach or failure to perform constitutes willful misconduct or recklessness." *Rodriguez v. Tech Credit Union Corp.*, 824 N.E.2d 442, 447 (Ind. Ct. App. 2005) (citing Ind. Code § 23-17-13-1).

The Plaintiffs respond that "exceptional circumstances" exist to hold Mitchell personally accountable for the allegations in the Amended Complaint. They state that Mitchell personally engaged in the discriminatory acts and therefore acted outside the scope of her capacity as director of Grandville. Moreover, the Plaintiffs argue that the Amended Complaint sufficiently alleges that Mitchell's conduct constitutes willful

misconduct or recklessness and that she failed to use the care of an ordinarily prudent person.  The Court agrees.

Taking all facts in the Plaintiffs favor demonstrates that Mitchell participated in the discrimination alleged by the Plaintiffs and thereby shed any immunity that her position may have afforded.  *See Matchmaker*, 982 F.2d at 1096 (agents held individually liable for compensatory damages for violation of 42 U.S.C. § 3604 since they personally engaged in discriminatory practices).  The Amended Complaint alleges that it was Mitchell who circled "rejected" on the "Grandville Coop Application Cover Page" associated with Morton and McFarland's applications without checking any one of the enumerated reasons on the form.  Dkt. 62, ¶¶ 74-75.  The Amended Complaint alleges that it was Mitchell who informed McFarland that the meeting was not New Member Orientation, but rather a "Pre-Interview" meeting.  *Id.*, ¶ 39.  It also states that Mitchell informed her daughter Tia Mitchell that she rejected McFarland and Morton's application because it would be "tacky" to have a hospital bed in the living room.  *Id.*, ¶¶ 66-67.  Mitchell also told a Grandville maintenance employee that Morton and McFarland's living arrangement was "not going to work" and "we don't want that around here."  *Id.*, ¶ 72.  The Court finds that the Plaintiffs have set forth sufficient factual matter to state a plausible claim of discrimination against Karen Mitchell in her individual capacity and outside the scope of her role as director of Grandville.  *Iqbal*, 556 U.S. at 678.

### F.  KIRKPATRICK

Finally, Defendants claim that the Amended Complaint fails to allege sufficient factual matter to support a claim against Kirkpatrick.  The Defendants further argue that "Plaintiffs once again offer no argument in response to Defendants' request for dismissal

of Kirkpatrick, and when a party fails to address an argument, it is proper for the court to conclude that the party has abandoned it." Dkt. 79 at 2. This would be true, but the Defendants first raise this argument in their reply brief, thereby denying the Plaintiffs the opportunity to respond. The only mention in Defendants' initial brief is found in the fact section and states that the Amended Complaint "merely lump[s]" Kirkpatrick in with other Defendants and "is devoid of any allegations that support their claims that Kirkpatrick violated the Fair Housing Act, Rehabilitation Act, or Indiana Fair Housing Act." Dkt. 73 at 2. Nowhere in their legal analysis section do the Defendants provide any legal justification for Kirkpatrick's dismissal. "Because the argument was not raised or developed in the opening brief, it is waived." *United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007).

Nonetheless, an examination of Defendants arguments in this regard would yield the same result. The Amended Complaint alleges violations of the FHA, IFHA, and the Rehabilitation Act, and Kirkpatrick is responsible for ensuring compliance with these laws. Dkt. 62, ¶ 23. Kirkpatrick is also responsible for providing guidance and direction with respect to the screening and selection of residents, which would include the denial of the applications of Morton and McFarland. *Id.*, ¶ 24. Plaintiffs have adequately pled that Kirkpatrick is involved in the predicate actions underlying the Amended Complaint. This is enough to spell out Kirkpatrick's potential involvement under the Rule 12(b)(6) standard.

### III. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants' Second Motion for Judgment on the Pleadings pursuant to Rule 12(c) with respect to Plaintiffs' claim for negligence in the Amended Complaint and **DENIES** the Motion to Dismiss with respect to all other claims. Accordingly, Plaintiffs' claim for negligence is **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED this 9th day of January, 2017

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Christopher Brancart
BRANCART & BRANCART
cbrancart@brancart.com

Thomas R. Kayes
BRANCART & BRANCART
tkayes@brancart.com

Melissa Keyes
INDIANA PROTECTION & ADVOCACY SERVICES
mkeyes@indianadisabilityrights.org

Thomas E. Crishon
INDIANA PROTECTION & ADVOCACY SERVICES
tcrishon@indianadisabilityrights.org

Brian P. Nally
REMINDER CO., L.P.A.
bnally@reminger.com

Lyndsay I. Ignasiak
REMINGER CO., LPA - College Park
lignasiak@reminger.com